UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT LEONHARDT, LAWRENCE M. FIRMANI,
and SAM CARUSO, for themselves and others similarly
situated, and UNITED STEELWORKERS OF AMERICA,
AFL-CIO-CLC,

                         Plaintiffs,                        Case No. 04-CV-72845

v.

                                               U.S. District Judge Nancy G. Edmunds

ARVINMERITOR, INC.; NORTH AMERICAN
ROCKWELL CORPORATION; ROCKWELL
INTERNATIONAL CORPORATION;
and ROCKWELL AUTOMATION,

                         Defendants.

_____/

**MEMORANDUM OPINION STATING FINDINGS OF FACT AND CONCLUSIONS OF
LAW AND GRANTING JOINT MOTION FOR APPROVAL OF CLASS ACTION
SETTLEMENT [50]**

# TABLE OF CONTENTS

I.    FINDINGS OF FACT ...................................................................................... 1

    A.    The Parties and the Class. ........................................................ 1
    B.    The Claims and Defenses. ........................................................ 3
    C.    The Settlement. ........................................................................ 4
    D.    The Settlement Negotiations ................................................... 4
    E.    The Settlement Agreement. ..................................................... 7
    F.    Class Counsel's Assessment. ..................................................10
    G.    Defense Counsel's Assessment ...............................................14
    H.    Notice to the Class. ..................................................................15
    I.    Objection and the Approval Process. .......................................16

II.    CONCLUSIONS OF LAW ............................................................................17

    A.    The Legal Standards. ...............................................................17
    B.    The Legal Standards Applied ..................................................21

    1.    Assessing the dispute and weighing continued litigation against settlement. ..............................................................21
    2.    The risk/delay/expense factor. ...............................................28
    3.    The judgment of counsel. .......................................................29
    4.    The discovery/evidence factor. ...............................................31
    5.    The fairness factor. ..................................................................32
    6.    The "arm's length" factor. ......................................................32
    7.    The public interest factor. .......................................................34

    C.    The Objection ...........................................................................34

III.    CONCLUSION ...............................................................................................36

Plaintiffs Robert Leonhardt, Lawrence M. Firmani, and Sam Caruso, for themselves and on behalf of the certified class; plaintiff United Steelworkers of America, AFL-CIO-CLC, now called United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC; and defendants ArvinMeritor, Inc., North American Rockwell Corporation, Rockwell International Corporation, and Rockwell Automation, pursuant to Fed. R. Civ. P. 23(e), moved for approval of the parties' Settlement Agreement (Docket 46, Ex. 1) to fully and finally resolve this class action. (Docket 50).

The Court preliminarily approved the Settlement Agreement on August 6, 2008, and approved a notice to class members which described the settlement, set an objection deadline, and scheduled a fairness hearing. (Docket 46 and 47). The notice and settlement documents were sent to class members on August 13, 2008. The Court conducted a fairness hearing on October 7, 2008. Based on the hearing and on submissions to the Court, the Court makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

1.      This class action addresses the reduction and cancellation of retiree health benefits.

### A.  The Parties and the Class.

2.      The individual plaintiffs and class representatives are retirees Robert Leonhardt, Lawrence M. Firmani, and Sam Caruso. The union plaintiff is the United Steelworkers of America, AFL-CIO-CLC, now called the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC ("USW").

3.      The defendants are ArvinMeritor, Inc.; North American Rockwell Corporation; Rockwell International; and Rockwell Automation.

4.      Rockwell International Corporation was formed in 1973 in a merger between North American Rockwell and Rockwell Manufacturing.  Rockwell International was a conglomerate of multiple divisions which owned and operated industrial plants throughout the United States, including plants supplying the automotive industry.  Rockwell's automotive division employed hourly workers represented by USW at plants in Logansport and Gary, Indiana; New Castle, Pennsylvania; and Newton Falls, Ohio.  Over the years, these plants closed or were sold.  In October 1997, Rockwell "spun-off" its automotive division which became Meritor Automotive, Inc.  In July 2000, Meritor merged with Arvin Industries to form ArvinMeritor, Inc.  In 2003, Rockwell International changed its name to Rockwell Automation.  See *Cole v. ArvinMeritor*, 515 F.Supp.2d 791, 794 (E.D. Mich. 2006).

5.      The Court certified the class, approved the individual plaintiffs as class representatives, and approved class counsel on February 9, 2006.  (Docket 39).  The certified class "consists of approximately 1,000 retirees who retired from USW-represented collective bargaining units at defendants' plants in Indiana, Ohio and Pennsylvania who receive or who have received health benefits from or through one or more defendants and, in addition, the retirees' spouses, other eligible dependents, and surviving spouses who receive or who have received health benefits from or through one or more defendants." (Docket 39, ¶2).

6.      The retirees in the class worked in USW-represented collective bargaining units at the plants in Logansport and Gary, Indiana; New Castle, Pennsylvania; and Newton Falls, Ohio.  Plaintiffs and class representatives Leonhardt and Caruso worked in New Castle.  Plaintiff and class representative Firmani worked in Logansport.  The class members are or were participants

and beneficiaries in ERISA-regulated welfare benefit plans created, sponsored and operated by defendants to provide health benefits for retirees and eligible dependents.

## B. **The Claims and Defenses.**

7.      Beginning in 2003, ArvinMeritor, administrator of the health benefits, increased co-pays, deductibles, and out-of-pocket maximums, shifted costs to class members and, effective January 1, 2006, cancelled health benefits for class members age 65 or over and declared the intention to make further reductions and cancellations and to discontinue permanently health benefits for all class members as each attains the age of 65.  The *Leonhardt* lawsuit, filed on July 15, 2004, challenged these actions.

8.      The individual plaintiffs sued for themselves and the class under Section 301 of the Labor-Management Relations Act (LMRA), 29 U.S.C. §185, and Section 502(a) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §1132(a).  USW sued under LMRA Section 301.  Plaintiffs claimed that defendants are obligated to keep promises made in collective bargaining agreements to provide hourly retirees and dependents with lifetime health benefits. Plaintiffs claimed that defendants broke these promises beginning in 2003, and continue to do so, by reducing and cancelling health benefits for class members.  Plaintiffs asked the Court to direct defendants to reinstate and continue health benefits for class members and to otherwise meet contractual and legal obligations under the agreements and ERISA.  (See Docket 1).

9.      Defendants responded that they did not promise lifetime health benefits, that their obligations to provide retiree health benefits ended with the expiration of each collective bargaining agreement, that the plants closed or were sold and there are no current agreements providing for continued retiree health benefits, that defendants have the legal right to reduce and

cancel retiree health benefits and properly did so in 2003 and later, and that they have the right to do so into the future. Defendants contended that they have no obligation under any agreement or ERISA or any other law to provide any retiree health benefits. Defendants asked the Court to dismiss the lawsuit. (See Docket 5 and 6).

## C. The Settlement.

10. Because the stakes are high and the litigation risks and uncertainties for all parties and class members are great, the parties engaged in settlement negotiations. Ultimately, the parties reached the mutually-acceptable compromise described in the Settlement Agreement. (Docket 46, Ex. 1). Under the Settlement Agreement, if given final approval by the Court, ArvinMeritor will pay $28,391,954.50 to resolve the lawsuit. Settlement funds will be used to form and fund a Voluntary Employees' Beneficiary Association ("VEBA") to provide health benefits for class members into the future.

## D. The Settlement Negotiations.

11. As the *Leonhardt* litigation progressed, the parties addressed defendants' motion to change venue and cross-motions addressing discovery disputes, engaged in discovery, including defendants' depositions of the individual plaintiffs, addressed class certification, and participated in an information exchange seeking to develop a comprehensive joint collection of relevant documents, including collective bargaining agreements, summary plan descriptions, and other documents spanning the decades going back to the 1960s. Despite the parties' efforts, there remained gaps in the joint document collection. The parties' review of the document collection did not resolve their core dispute over whether the retiree health benefits were vested and lifetime

benefits or were not, and so were subject to unilateral reduction and cancellation by defendants. In this context, the parties began settlement discussions in 2006.

12.     The settlement discussions involved the parties' counsel and other professionals in face-to-face meetings, telephone conversations and written communications. The parties exchanged and evaluated information and exchanged and debated proposals and counterproposals as the settlement negotiations continued in 2006 and through 2007 and, finally, culminated in the parties' Settlement Agreement and the related documents filed with the Court on August 1, 2008. (Docket 46, Ex. 1-4).

13.     In the course of the negotiations, the parties exchanged and discussed information about class members and health benefits. In particular, the parties discussed the plans and benefits that defendants provided at various times to retirees from the plants in Pennsylvania, Indiana, and Ohio, and to the retirees' eligible dependents, and ArvinMeritor provided information about benefits costs and about the ages and locations of class members. The parties discussed various approaches to settlement, ultimately focusing on payment by defendants of an amount to fund a VEBA trust to provide health benefits to class members into the future.

14.     The parties began discussions about the appropriate amount of settlement funds with foundational information, beginning with ArvinMeritor's FAS 106 valuation of accumulated post-retirement health benefit obligations for class members based on a 2001 report prepared by PriceWaterhouseCoopers. That report was the most complete valuation available predating the 2003 changes. Using that report as a starting point, the parties discussed -- and negotiated over -- adjustments to the valuation to account for actual expenditures since 2001 and anticipated future costs. These adjustments included deductions from and additions to the 2001 FAS 106 number,

adjusting for projected earnings, called the "discount rate," for actual benefits paid and administrative costs expended since June 30, 2001, for anticipated administrative and professional costs to be incurred by the VEBA in the future, for a reimbursement procedure anticipated by the VEBA to in part compensate for the 2006 termination of benefits affecting the vast majority of class members, for anticipated medical cost inflation, for attorney fees and expenses related to the litigation, and for what the parties called "litigation risk."

15.     The parties debated appropriate adjustment levels, at times differing considerably, particularly about discount rate and medical cost inflation projections and litigation risk. Eventually the parties exchanged settlement proposals, continued their discussions over time, refined their proposals and counterproposals, and ultimately, agreed on a settlement number: $28,391,954.50.  During the course of the settlement discussions, class counsel regularly reported to the individual plaintiffs and class representatives and obtained their authority for settlement within defined boundaries.   The $28,391,954.50 settlement amount was agreed upon with the authority of all plaintiffs and the approval of class counsel.

16.     Once the settlement amount was agreed upon, the parties began work on a letter agreement to confirm the principal terms of the settlement -- the amount, the process for seeking a judgment from the Court, the VEBA structure, payment terms, and other matters.  Drafting the letter agreement was time-consuming and involved additional negotiations.  Ultimately, the letter agreement was signed for plaintiffs on September 5, 2007 and for defendants on September 7, 2007.  It included the following:  "The parties recognize that there are numerous details to work out regarding the specific terms of the settlement.  The parties will undertake to work out those

terms and memorialize them in a written settlement agreement. The parties commit to doing so promptly and cooperatively."

17.    The drafting of the Settlement Agreement and related documents proved time-consuming, too, and engendered additional negotiations and the need to address potential issues under ERISA and other legal authority affecting the structure of the VEBA and the content of the Settlement Agreement. Ultimately, the parties reach full agreement on the necessary documents and, on August 1, 2008, filed them with the Court with a joint motion seeking preliminary approval of the settlement and the Settlement Agreement and seeking approval of a proposed notice to class members describing the settlement and setting a Rule 23(e)(2) fairness hearing. (Docket 46). The documents included the Settlement Agreement, the Trust Agreement, grids describing six healthcare programs that were planned to be offered to class members through the VEBA after final approval of the settlement, the proposed class notice, and a proposed cover letter from the USW general counsel briefly summarizing and endorsing the settlement. (Docket 46, Ex. 1-4). The Court preliminarily approved the settlement and the Settlement Agreement and approved the class notice and the other settlement-related documents on August 6, 2008. (Docket 47).

### E.  The Settlement Agreement.

18.    Under the Settlement Agreement (Docket 46, Ex. 1), if approved by the Court, ArvinMeritor will pay $28,391,954.50 to resolve the lawsuit. Settlement funds will be used to form a trust that will constitute a VEBA under Section 501(c)(9) of the United States Internal Revenue Code to provide health benefits for class members into the future. (Docket 46, Ex. 1, ¶¶4, 12). The VEBA will be governed by the Trust Agreement. (*Id*., Ex. 4). The VEBA will be

operated and managed by an independent Committee and by an institutional Trustee according to the terms of the Trust Agreement. (Docket 46, Ex. 1, ¶6). Defendants ultimately will be released from retiree healthcare responsibilities, subject to their funding obligations specified in the Settlement Agreement and their obligations to cooperate with USW, the other plaintiffs, and the VEBA Committee "to facilitate the formation of the VEBA and the VEBA's formative efforts to commence providing health benefits to class members." (*Id.*, ¶8). Once formed, the VEBA will be governed pursuant to the Trust Agreement by the Committee and the Trustee.

19. Under the Settlement Agreement, ArvinMeritor is to pay the full settlement amount no later than three business days after the entry of judgment approving the settlement and exhaustion of any appellate proceedings. (Docket 46, Ex. 1, ¶12(b)). Payment of the full settlement amount and compliance with the Settlement Agreement "will satisfy all claims made in the lawsuit, including all alleged damages incurred by Plaintiffs and class members related to health benefits claimed in the lawsuit, and all attorney fees for Plaintiffs' counsel and costs incurred by Plaintiffs in connection with the lawsuit." (*Id*., ¶12; see also ¶14(b)). Defendants are to bear their own fees and expenses; the settlement amount is not be used to cover fees or expenses incurred by defendants or defendants' fees or expenses related to defendants' obligations under the Settlement Agreement. (*Id*., ¶12). Once the Settlement Agreement is approved and fully implemented, defendants are to be released from all health benefit obligations to class members and future health benefits will be provided only by or through the VEBA. (*Id.*, ¶14).

20. The initial VEBA Committee is to consist of chair Jeanette Stump, a health benefits specialist with the USW Pension and Insurance Department; John Sellers, a retired USW Executive Vice President who was in charge of the Rubber/Plastics Industry Conference; and

Thomas J. Clancy, a retired Assistant Director of the USW Office, Technical and Professional Department and Coordinator of Public Employee Services. The Committee is to select a banking institution to serve as the initial Trustee. (Docket 46, Ex. 1, ¶6). The Committee has been operating informally at the request of plaintiffs in anticipation of approval of the Settlement Agreement.

21. The Committee, in anticipation of the settlement being approved, reviewed available health benefits programs and selected various healthcare program options that the Committee anticipates can be made available to class members promptly after final approval of the settlement. These programs all are insured healthcare plans. All provide comprehensive benefits, including doctor and hospital services and prescription drugs coverage. Medicare-eligible class members initially are to have five programs to chose from depending on individual preference and geographic location. Approximately 85% of class members are currently Medicare-eligible. Class members not yet Medicare-eligible are to have one initial program option; when they become age 65, they will be able to choose among the available programs for Medicare-eligible class members. VEBA funds are to pay 70% of the premium for each of these initial programs, with the 30% balance of the premium to be paid by covered individuals. The initial programs expected to be implemented by the Committee are detailed in the class notice and on the grids accompanying the class notice. (Docket 46, Ex. 2).

22. The initial programs were selected by the Committee based on cost, benefits, assessment of the insurers/providers, and geographic availability. The Committee plans that VEBA funds initially will pay 70% of the premium cost, selecting that percentage as prudent for the first year, subject to later adjustment as the VEBA develops experience and assesses actual

costs, medical cost inflation, and earnings on VEBA funds. It is anticipated that the Committee periodically will review the healthcare programs provided through the VEBA and available alternatives, and will consider input from the retiree advisory group contemplated by the Trust Agreement (Docket 46, Ex. 4, §10.14), and that the Committee will change the programs or add or substitute other programs from time to time as consistent with the purposes of the Trust Agreement and the prudent use of VEBA funds in the interest of class members into the future.

## F. Class Counsel's Assessment.

23.     In the course of the settlement negotiations and the preparation of the documents related to the settlement, class counsel consulted two VEBA and ERISA benefits lawyers and relied on the expertise and advice of others with VEBA and health benefits experience, including Jeanette Stump and USW Pension and Benefits Department Director Thomas Duzak. In particular, class counsel drew on research and analysis provided by Mrs. Stump, who aided in the formulation of plaintiffs' settlement proposals and in the assessment of defendants' proposals and information, and who directly participated in settlement discussions and in direct communications with defense counterparts. Throughout the settlement process, too, class counsel reported to and consulted with the individual plaintiffs and class representatives and also drew on the experience and expertise of USW staff counsel. All on plaintiffs' side concluded that settlement was in the best interests of the class and all concur that the settlement terms embodied in the Settlement Agreement are fair, reasonable, and adequate.

24.     Counsel for both sides filed a joint motion for approval of class settlement, and concur in the settlement. (Docket 50). Class counsel identified a number of factors that led them to the conclusion that the settlement is fair, reasonable, and adequate.

25. Class counsel considered the risk and uncertainty involved in continued litigation. They analyzed the law, the governing collective bargaining agreements and other documents, and the potential extrinsic evidence available to support plaintiffs' case and available to support defendants' resistance to plaintiffs' case. While class counsel believed that plaintiffs had a substantial case, they also recognized that the defendants, too, had substantial arguments, that continued litigation would likely be vigorously contested by defendants, that there were gaps in the collective bargaining and document histories, that plaintiffs had the burden of proof, and that the outcome of the litigation was uncertain.

26. Class counsel considered the high stakes, recognizing that continued litigation was a "zero sum" undertaking in which the likely outcome would be that one side achieved total victory while the other side experienced total defeat. They considered that if plaintiffs did not prevail, the outcome would be disastrous. The post-Medicare class members -- whose benefits were discontinued on January 1, 2006 -- would recover nothing. The pre-Medicare class members -- about 15% of the class, a dwindling group as class members age -- would have continued benefits only so long as ArvinMeritor chose to continue those benefits and could lose all benefits at any time during continued litigation. In any event, like the other class members, the pre-Medicare class members would lose all benefits at age 65, and, if plaintiffs did not prevail, also would end up with nothing.

27. Class counsel also considered the delay attendant to continued litigation. They concluded that litigating to a final resolution would likely take years, including adjudication in the district court and, whatever the outcome in the district court, likely appeal to the Sixth Circuit. They considered that delay itself worked a substantial hardship. The majority of class members --

approximately 85% -- had been without company-paid benefits, as company-paid health coverage ended for Medicare-eligible class members on January 1, 2006.  Settlement would provide prompt and certain relief for these class members.  In addition, likely mortality rates meant that many class members, particularly many in their 80s and 90s, likely would not benefit from even the most favorable resolution of the litigation if that favorable resolution did not come until more years had passed.

28.     Based on these factors -- risk, uncertainty, delay, the disaster of loss, ongoing hardship, and the post-Medicare status of the majority of class members -- class counsel, in consultation with plaintiffs, concluded that it made sense to pursue the possibility of settlement. During early discussions, as noted, the parties focused on a settlement structure that would remove defendants from retiree healthcare and that would fund an independent VEBA to provide class members with health benefits under the auspices of fiduciaries charged with the responsibility to act in the best interests of the class.

29.     In the settlement negotiations, plaintiffs sought an amount that would permit the formation and operation of a VEBA to provide comprehensive, insured medical, hospital, and prescription drug benefits.  Jeanette Stump surveyed the market and developed a number of healthcare plan options, considering cost, benefits levels, and geographic availability.  Eventually her research and efforts resulted in the six initial programs described in the class notice and grids. (Docket 46, Ex. 2)  Plaintiffs also sought a settlement amount that would permit the VEBA to provide comprehensive benefits under any likely scenarios for a reasonable period into the future, at least into the 2020s.  To set their monetary "bottom line," plaintiffs estimated the present costs of lifetime benefits and adjusted those costs by various factors, including estimated mortality rates,

medical cost inflation rates, and discount rates. They also adjusted their "bottom line" by factoring in litigation risk, which, they concluded, warranted -- and would require -- compromise. In consultation with class counsel and the other individuals proposed as VEBA Committee members, Jeanette Stump made projections about administrative and benefits costs, longevity/mortality, medical cost inflation, and discount rates and she assisted plaintiffs in setting settlement objectives, formulating plaintiffs' proposals, and assessing defendants' proposals, and she directly participated in the negotiations and in communications with defense counterparts.

30.     Class counsel and Mrs. Stump developed their settlement objectives and strategy in consultation with the individual plaintiffs and class representatives. The parties ultimately reached agreement on the $28,391,954.50 settlement amount. This amount was consistent with plaintiffs' criteria and objectives and within the authority given class counsel by the individual class representatives. Again, class counsel concluded that this settlement was fair, reasonable, and adequate, and in the best interests of class members, and that it was the best available alternative and provided a resolution far more favorable than continued litigation with its attendant risks, uncertainties, delay, and continued hardships.

31.     As noted, in consultation with the other two individuals expected to be VEBA Committee members, and based on her survey of the market and consultation with insurers, class counsel and the individual plaintiffs, Jeanette Stump recommended the six healthcare programs described in the grids to be initially available to class members through the VEBA. It is anticipated that these plans can be offered through the VEBA promptly, after an expeditious enrollment period. If judgment is entered in October 2008 and becomes final in November 2008,

the Committee anticipates that enrollment can take place in November and December 2008 and that these plans can be provided through the VEBA beginning on January 1, 2009.

32.     In sum, class counsel concluded that the settlement will bring final resolution to the litigation, end uncertainty, eliminate the risk of disastrous loss, and stop the hardship attendant to further delay.  The settlement provides for a payment of $28,391,954.50 which will permit the creation of the VEBA to provide class members with health benefits into the future, will pay the attorney fees and expenses incurred in the course of this litigation, with fees based on work hours at reasonable rates subject to Court approval, and will put future benefits in the hands of a VEBA Committee responsible to act in the best interest of the class, able to do so unaffected by company preferences and finances and any other company-related vicissitudes.  Class counsel concluded that the settlement is the best available alternative, is fair, reasonable and adequate under Rule 23, and is a highly successful and positive result of significant benefit to the class.

### G.  Defense Counsel's Assessment.

33.     Defense counsel concur that the settlement is fair, reasonable, and adequate and is a mutually-beneficial and positive resolution of the parties' dispute, bringing certainty, avoiding more delay, and eliminating the risk of loss, and providing salutary and valuable benefits to defendants' retirees and the retirees' eligible dependents.

34.     As addressed ahead, the Court concurs with the parties and counsel and finds that the settlement is fair, reasonable, and adequate under Rule 23(e)(2).

### H.  Notice to the Class.

35.     The class notice -- titled "Important Notice About Health Benefits For Steelworkers/Rockwell Retirees And Their Families" (Docket 46, Ex. 2) -- was approved by the Court on August 6, 2008.  (Docket 47).  ArvinMeritor sent the notice by first class mail to class members on August 13, 2008.

36.     The class notice summarized the litigation and the settlement negotiations, the settlement, and the approval process.  The notice mailed to class members was accompanied by complete copies of the Settlement Agreement (Docket 46, Ex. 1) and the Trust Agreement (*Id.*, Ex. 4), a letter from USW General Counsel Paul Whitehead briefly explaining and endorsing the settlement (*Id.*, Ex. 3), and the grids detailing the six healthcare plan options that the VEBA Committee intends to offer to class members initially, once a judgment approving the settlement is final.  (*Id.*, Ex. 2).

37.     The class notice outlined its purpose and summarized the lawsuit, identifying the parties and the lawyers, defining the certified class, and outlining the parties' claims and defenses.  (Docket 46, Ex. 2, ¶¶1-3).  The notice described the settlement negotiations and summarized the settlement terms -- the settlement amount and payment deadline, the VEBA to be governed by the three-person Committee and the banking institution to serve as Trustee, the contemplated limited reimbursement payments to be available to certain class members, the anticipated fee and expense requests to be filed with the Court by class counsel, the fact that the settlement would release defendants from all health benefits obligations to class members and that future health benefits would be provided only by or through the VEBA, and other matters governed by the Settlement Agreement and the Trust Agreement.  (*Id.* ¶¶3, 4, and 6).  The notice identified the three members

of the initial VEBA Committee, addressed the fiduciary responsibilities of the Committee and the Trustee, and described the retiree advisory group which is to consult with the Committee into the future regarding health benefits, costs, and related matters.  (*Id*. at ¶¶4(b), (f) , and (g)).  The class notice summarized the six initial healthcare plans selected by the Committee and anticipated to be made available to class members promptly after finality of a judgment approving the settlement.  (*Id*. at ¶5).

38.     The class notice outlined the parties' reasons for settlement, specified that it represented compromise, described the procedure for objecting to the settlement, set a September 15, 2008 postmark deadline for class member objections, and provided notice of the time and location of the October 7, 2008 fairness hearing.  (Docket 46, Ex. 2, ¶¶6-7; Docket 50, Ex.6).

39.     The class notice advised class members of access to all court filings at the courthouse and through PACER and invited class members to request additional information about the litigation, the settlement, or the procedure from class counsel by mail or e-mail.  (Docket 46, Ex. 2, ¶8).

40.     The class notice reiterated and summarized salient points at the end, and again called attention to the objection procedure and to the opportunity for class members to request additional information from class counsel. (Docket 46, Ex. 2, ¶9).

### I.  Objection and the Approval Process.

41.     One class member out of the approximately 1,000 class members filed an objection to the settlement.  He objected to the amount of the premium cost that he and his wife would pay under two of the healthcare plans that initially will be available to class members if the settlement

is approved, questioning whether the settlement benefitted him or his wife.  (Docket 50, Ex. 4).

His objection is addressed in more detail ahead.

42.     Pursuant to the Court's August 6, 2008 order (Docket 47), the parties filed a Joint

Motion For Approval of Class Settlement on September 25, 2008.  (Docket 50).

43.     The Court held a fairness hearing on October 7, 2008.  No class members appeared

at the hearing to present an objection.

44.     As discussed next, the Court concludes that the parties' settlement, concurred in by

counsel for both sides, is the product of reasoned, informed "arm's length" negotiations which

produced a mutually-beneficial settlement that eliminates risk, ends uncertainty, avoids further

delay, promptly alleviates hardship, and is consistent with the public interest, and, in all these

circumstances, is fair, reasonable, and adequate under Rule 23(e)(2).

## II.  CONCLUSIONS OF LAW

This Court has jurisdiction under LMRA Section 301, 29 U.S.C. §185, and ERISA

Sections 502(3)(1) and (f), 29 U.S.C. §§1132(e)(1) and (f).

This is a certified class action under Fed.R.Civ.P. 23(a) and (b)(1) and (2) and (g) as

decided by the Court on February 9, 2006 in the order certifying this class action and approving

class representatives Leonhardt, Firmani and Caruso and class counsel.  (Docket 39).

### A.  __The Legal Standards.__

The law favors the settlement of class action litigation.  See *UAW v. General Motors Corp.*,

497 F.3d 615, 632 (6th Cir. 2007) (noting "the federal policy favoring settlement of class actions");

*IUE-CWA v. General Motors Corp.*, 238 F.R.D. 583, 593 (E.D. Mich. 2006) (noting "the general

federal policy favoring the settlement of class actions"); and *Steiner v. Fruehauf corp.*, 121 F.R.D.

304, 305 (E.D. Mich. 1988) *aff'd sub nom Priddy v. Edelman*, 883 F.2d 438, 447 (6th Cir. 1989) ("case law favors the voluntary settlement of class actions").

"The claims, issues, or defenses of a certified class may be settled ... only with the court's approval." Fed. R. Civ. P. 23(e).

To warrant district court approval, a class action settlement must be "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *UAW v. General Motors*, 497 F.3d at 631 ("Before approving a settlement, the district court must conclude that it is 'fair, reasonable, and adequate.'"); *In re Cardizem CD Antitrust Litigation*, 218 F.R.D. 508, 522 (E.D. Mich. 2003) (citations omitted), *appeal dismissed* 391 F.3d 812 (6th Cir. 2004), *cert. denied* 544 U.S. 1049 (2005) ("In deciding whether to grant final approval of the Proposed Settlement, this Court must determine, after holding a fairness hearing, whether the settlement is 'fair, adequate and reasonable'").

"The evaluation and approval of a class settlement is committed to the sound discretion of the district court." *IUE-CWA*, 238 F.R.D. at 594, citing *inter alia, Clark Equip. Co. v Allied Industrial Workers*, 803 F.2d 878, 880 (6th Cir. 1986), *cert. denied* 480 U.S. 934 (1987). The district court "should approve a class settlement if, following a hearing, the court determines that the settlement 'is fair, reasonable, and adequate.'" *IUE-CWA*, 238 F.R.D. at 593.

The district court's "role in passing upon the propriety of a class action settlement is limited to a determination of whether the terms proposed are fair and reasonable to those affected." *Steiner*, 121 F.R.D. at 305, citing, *inter alia, Williams v. Vukovich*, 720 F.2d 909 (6th Cir. 1983). The district court's evaluation of a class action settlement "must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties and that the settlement, taken as a whole, is fair,

reasonable and adequate to all concerned." *Clark Equip. Co.*, 803 F.2d at 880 (citation omitted); *IUE-CWA*, 238 F.R.D. at 594 (same).

In assessing a class action settlement, the district court is to assess the settlement with regard to a "range of reasonableness " which "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *IUE-CWA*, 238 F.R.D. at 594 (citations omitted). See also *Cardizem*, 218 F.R.D. at 523 (applying a "range of reasonableness" measure). The district court is to consider "whether the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued." *Cardizem*, 218 F.R.D. at 522 (citation omitted). In assessing a proposed settlement, the district court "should not substitute its judgment for that of the parties." *Steiner*, 121 F.R.D. at 306. See also *IUE-CWA*, 238 F.R.D. at 594 (citations and quotations marks omitted) (the court "must respect the parties' compromise" and "may not substitute his or her judgment for that of the litigants and their counsel").

Before conducting a fairness hearing, a district court must "direct notice in a reasonable manner to all class members who would be bound" by the settlement. Fed. R.Civ. P. 23(e)(1). The notice should be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *UAW v. General Motors*, 497 F.3d at 629, citing, *inter alia, Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

The Court finds that the class notice and related documents approved by the Court on August 6, 2008 (Docket 46, Ex. 1-4 and Docket 47), sent by ArvinMeritor by first class U.S. mail on August 13, 2008 to all class members, satisfied Rule 23(e)(1) notice requirements. In particular,

the notice explained the settlement in detail, advised class members that it would release defendants from all health benefits obligations to them and that future health benefits would be provided only by or through the VEBA, clearly set out the objection procedure and deadline, provided a mechanism for class members to seek further information, and was accompanied by the salient source documents -- the Settlement Agreement and the Trust Agreement as well as grids detailing the initial healthcare programs that are anticipated to be made available through the VEBA. See *UAW v. General Motors*, 497 F.3d at 630 (upholding notice which "clearly explained its purpose, discussed the nature of the pending suit and proposed class and accurately summarized the 76-page settlement agreement and incorporated exhibits" and which also enclosed a "copy of the settlement agreement, ensuring that retirees would have full access to the very document the district court would examine at the fairness hearing").

The purpose of the fairness hearing is to provide "procedural safeguards" giving class members the opportunity to present objections on the record and giving the parties the opportunity to present "sufficient evidence to allow the district court to review the terms and legitimacy of the settlement." *UAW v. General Motors*, 497 F.3d at 635. "In satisfying these requirements, a district court has wide latitude." *Id.* The court may "limit the fairness hearing to whatever is necessary to aid it in reaching an informed, just and reasoned decision." *Id.* (citations omitted). The fairness hearing need not "entail the entire panoply of protections afforded by a full-blown trial on the merits." Rather, the district court has "the discretion to limit the fairness hearing" to whatever is "consistent with the ultimate goal of determining whether the proposed settlement is fair, adequate and reasonable." *Tennessee Assoc. of HMOs, Inc.*, 262 F.3d 559, 567 (6th Cir. 2001).

The Sixth Circuit identified seven "factors" that "guide the inquiry" undertaken by the district court: "(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest." *UAW v. General Motors*, 497 F.3d at 631, citing *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992) and *Williams v. Vukovich*, 720 F.2d 909, 922-923 (6th Cir. 1983). See also *IUE-CWA*, 238 F.R.D. at 594; *Cardizem*, 218 F.R.D. at 522; and *Steiner*, 121 F.R.D. at 305-306. In considering the seven factors, the district court may choose to "consider only factors that are relevant to the settlement and may weigh particular factors according to the demands of the case." *IUE-CWA*, 238 F.R.D. at 594-595, citing, *inter alia*, *Granada,* 962 F.2d at 1205-1206.

## B. The Legal Standards Applied.

Here, as detailed ahead, considering the pertinent factors, the Court concludes settlement is fair, reasonable and adequate under Rule 23(e)(2).

### 1. Assessing the dispute and weighing continued litigation against settlement.

The fairness of a class action settlement "turns in large part on the bona fides of the parties' legal dispute." *UAW v. General* Motors, 497 F.3d at 631. In assessing the parties' legal dispute, the district court's task "is not to decide whether one side is right or even whether one side has the better of these arguments....The question rather is whether the parties are using settlement to resolve a legitimate legal and factual legal dispute." *Id.* at 632 (finding a legitimate dispute over whether "collective bargaining agreements vest former union workers with their healthcare benefits upon retirement"). *Id.* at 631.

In assessing the parties' dispute and weighing the likelihood of plaintiffs' success on the merits if the litigation continues against the benefits to plaintiffs of the settlement, the ultimate question for the district court is only whether the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued. *IUE-CWA*, 238 F.R.D. at 595, citing, *inter alia*, *Cardizem*, 218 F.R.D. at 522. It is neither required nor is it possible for a district court to determine that the proposed settlement is the fairest possible resolution of the claims of every individual class member; rather, the court need only determine whether the settlement taken as a whole, is fair, adequate and reasonable. *IUE-CWA*, 238 F.R.D. at 595, citing, *inter alia, Clark Equip.*, 803 F.2d at 878. Although assessing this factor requires some evaluation of the merits of the dispute, the district court need not resolve the dispute and must refrain from reaching conclusions on issues which have not been fully litigated. *IUE-CWA*, 238 F.R.D. at 595 (citation omitted).

Here, consideration of this factor leads to the conclusion that there is indeed a legitimate dispute and that resolution of this lawsuit by the settlement better serves the class than continued litigation.

The core of the parties' dispute is whether retiree health benefits are, under the series of collective bargaining agreements extending back to the 1960s, vested, unalterable, lifetime benefits or whether they are not, and so may be unilaterally reduced or terminated at defendants' discretion. The parties' views on this question are diametrically opposed. Resolution of this core question would involve adjudication of sharply-contested disagreements based on decades of collective bargaining agreements and possibly other documents and evidence -- including summary plan descriptions, correspondence, collective bargaining history, and other extrinsic

evidence. The parties recognize that the pertinent history is both incomplete and susceptible to conflicting interpretations, and that it provides the foundation for substantial and good-faith arguments that may be advanced in favor of each side. In addition, the parties recognize, and the Court concurs, that continued litigation would be a high stakes "zero sum" undertaking, in which one party is likely to achieve complete victory while the opposing party experiences complete defeat because the parties' core positions on whether or not retiree health benefits are vested are irreconcilable.

History confirms the parties' assessment that litigating retiree health benefits disputes entails risk and uncertainty, and typically produces a "zero sum" result. For example, plaintiffs invoke authorities such as *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983), *cert denied*, 465 U.S. 1007 (1984); *McCoy v. Meridian Automotive Sys.*, 390 F.3d 417 (6th Cir. 2004); and *Cole v. ArvinMeritor*, 515 F.Supp.2d 791 (E.D. Mich. 2006) (appeal pending) (decided by this Court, involving some of the same counsel and the same defendants, but addressing a different union, different retirees, and different collective bargaining agreements and history). In those cases retiree claims to lifetime benefits were upheld based on contracts and were supported by extrinsic evidence. At the same time, defendants invoke authorities such as *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir 1998) and *Adams v. Avondale Indus.*, 905 F.2d 943 (6th Cir. 1990). Those cases found no contractual promises of lifetime retiree benefits. Indeed, the Court recognizes that retiree benefits litigation is fact-specific and often requires detailed analysis of extensive documentation and distant collective bargaining history, and that retiree benefits litigation is typically complex, labor-intensive, time-consuming and protracted and, often, in doubt until the end of years of litigation.

Moreover, recent litigation addressing similar disputes ended in resolutions similar to the settlement reached by the parties here, reflecting the judgment of district courts and similarly-situated litigants that reasonable compromise is preferable to the risks and other detriments of sharply-contested litigation. Those resolutions, providing for the formation and funding of VEBAs to continue contested retiree health benefits, were approved by courts as appropriate settlements of similar high stakes class action lawsuits over whether retiree health benefits were vested. See, e.g., *UAW v. General Motors Corp.*, 497 F.3d 615, 632 (6th Cir. 2007) (emphasis in original):

> What makes these settlements particularly sensible, moreover, is that even if this merits question favored one party over the other, the retirees still would have had ample reason to control the resolution of this dispute through negotiation today rather than litigation tomorrow. If we decided for the sake of argument that the retirees were likely to lose the *Yard-Man/Sprague* debate, little would stand in the way of the car companies reducing or even eliminating the retirees' healthcare benefits in the future. If we decided for the sake of argument that the retirees were likely to win the debate, any such victory would run the risk of being a Pyrrhic one ... [I]t is well to remember that the Federal Government's Pension Benefit Guaranty Corporation, which provides *pension* guarantees for the employees and retirees of financially distressed companies, has no sister agency that provides the same guarantees for retiree *healthcare* benefits.

See also *IUE-CWA v. General Motors Corp.*, 238 F.R.D. 583 (E.D. Mich. 2006) (findings of fact and conclusions of law approving class action settlement providing for the VEBA to resolve retiree healthcare benefits litigation); *UAW v. Chrysler LLC*, 2008 WL 2980046 (E.D. Mich., July 31, 2008) (same); *UAW v. General Motors Corp.*, 2008 WL 2968408 (E. D. Mich., July 31, 2008) (same); and *UAW v. Ford Motor Co.*, 2008 WL 4104329 (E. D. Mich., August 29, 2008) (same).

Here, the Court finds that the parties' dispute is genuine, that the outcome of continued litigation is uncertain, and that continued litigation would carry substantial risks for both sides, and

that, in particular, class members would bear the risk that continued litigation will leave them with nothing because of loss and, in some cases, also because of delay. These circumstances, the Court finds, militate in favor of a settlement that ends uncertainty, avoids further delay, eliminates risk, promptly ameliorates hardship, and provides significant benefit to each side and to the class as a whole.

Again, in this context the Court need not and should not decide the merits of the case or resolve the unsettled legal questions it presents. *IUE*-CWA, 238 F.R.D. at 595. It is sufficient to warrant approval of the settlement to determine that the Settlement Agreement is a rational and salutary resolution of contested, uncertain, protracted, and risky litigation. The Court makes that determination here.

Here, if defendants were to prevail, all class members would end up with absolutely nothing. Indeed, defendants already eliminated retiree health coverage for all Medicare-eligible class members who make up approximately 85% of the class. If the defendants were to prevail, it is impossible to imagine that lost benefits ever would be reinstated or that any benefits would be continued or provided in the future for Medicare-eligible class members. Defendants have reduced, but not eliminated, health benefits for pre-Medicare class members, a group that is dwindling as pre-Medicare class members reach age 65. Defendants have continued benefits for pre-Medicare class members during the litigation and settlement process, so far. However, defendants have asserted the right to discontinue these benefits and all other continued benefits at any time, solely in defendants' discretion. Moreover, even if defendants were to continue pre-Medicare benefits during continued litigation, if defendants were to prevail at the end they would be free to immediately discontinue all benefits for all class members, and likely would do

so, leaving the entire class with no company-supported health benefits. In short, if plaintiffs did not prevail, sooner or later, in defendants' sole discretion, all class members assuredly would have no health benefits through defendants, ending up with absolutely nothing. On the other hand, if plaintiffs were to prevail, that would entail significant consequences for defendants, affecting their finances and operations and creating long-term liability in a difficult and competitive economy, tying the fate of the benefits to defendants' long-term financial health. And, as counsel note, even if plaintiffs were to prevail at the end of continued litigation, it is likely that for many class members victory would come too late. Considering these stakes, "it is entirely responsible and appropriate for the parties to resolve, rather than litigate, their dispute." *IUE-CWA*, 238 F.R.D. at 595-596.

While the parties have not agreed on the precise mathematical percentage of the "best case/worst case" litigation result represented by their $28,391,954.50 settlement figure, they agree that the figure represents a substantial portion of the value of the disputed benefits and they agree that the settlement will permit the VEBA to make benefits available to class members for years into the future, expected to extend at least into the 2020s. They agree, too, that the settlement amount represents an informed compromise, with plaintiffs receiving something less than the fully-paid lifetime benefits claimed and with defendants paying a substantial sum for benefits which they claim they are not obligated to pay for at all. Compromise is necessary and appropriate in these circumstances. All settlements involve compromise, and courts "routinely recognize that settlements never equal the full value of the loss claimed by the plaintiffs." *IUE-GM*, 238 F.R.D. at 596 (citations omitted). The question for this Court is whether the settlement falls within a

"range of reasonableness" and "not whether it is the most favorable possible result in the litigation." *Id*. at 596, citations omitted.

Here, the benefit to the class of the settlement is substantial. It will establish the VEBA and enable the VEBA to provide comprehensive, insured medical, hospital, and prescription drug coverage to class members at modest cost. (The Advantra PPO plan initially available to Medicare-eligible class members in Pennsylvania, for example, will require a class member to pay a $32.03 monthly premium, see Docket 46, Ex.2). The settlement will provide substantial funds to accomplish this purpose years into the future and it will place responsibility for administering those funds in the hands of the independent Committee and the Trustee whose sole responsibility will be to serve the interests of class members enrolled in the health plans provided through the VEBA, unaffected by defendants' interests and unfettered by defendants' preferences or future business operations or financial performance.

In addition, as noted, the settlement will allow for the VEBA to promptly make substantial health benefits available to the approximately 85% of class members whose coverage was cancelled by ArvinMeritor on January 1, 2006. As noted, the VEBA Committee made preliminary decisions on the initial benefits programs to be available to class members. Again, these programs provide comprehensive insured plans at modest cost to class members, with the VEBA covering 70% of premiums. As in *IUE-CWA*, a "decision to accept modest cost increases in order to obtain assured relief for the Class is reasonable and appropriate." 238 F.R.D. at 596. Here, at most, only about 15% of class members are expected to incur cost increases, and only temporarily. In addition, as noted, the VEBA Committee, with the assistance of a retiree advisory group, will have the flexibility to make changes in the healthcare plans provided through the VEBA, or may add or

eliminate plans or benefits coverage, or may make other substantive changes from time to time based on earnings on VEBA assets and healthcare market rates and other factors, according to what the Committee determines to be in the best interest of class members in the exercise of the Committee's fiduciary responsibilities.

In short, the settlement resolves uncertain, risky, protracted litigation in which the legal merits are the subject of a vigorous, genuine, good faith dispute. The settlement provides substantial funding for a VEBA to make available comprehensive health benefits into the future for all class members, and provides for the administration of those funds by a Committee and Trustee with fiduciary responsibilities to act in the best interests of class members. Accordingly, the Court concludes that settlement is informed, prudent, and rational, within an appropriate "range of reasonableness" and beneficial to all parties, and that the Settlement Agreement is fair, reasonable, and adequate under Rule 23(e)(2).

## 2. The risk/delay/expense factor.

Whatever the relative merits of the parties' legal positions, there is no risk-free, expense-free litigation. *IUE-CWA*, 238 F.R.D. at 596. In *IUE-CWA*, Judge Hood noted the protracted litigation in two retiree health benefits cases finally decided by the Sixth Circuit: *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998), which after nine years of litigation upheld the employer's right to modify salaried retirees' benefits, and *Bittinger v. Tecumseh Products*, 201 F.3d 440 (6th Cir. 1999), which after eight years of litigation affirmed the employer's right to modify retiree health benefits. See also *UAW v. General Motors*, 2006 WL 891151 (E.D. Mich.) at *17 ("The obvious costs and uncertainty of such lengthy and complex litigation weigh in favor of settlement"), consol. and aff'd. *UAW v. General Motors*, 497 F.3d 615

(6th Cir. 2007), and *In re Cincinnati Policing*, 209 F.R.D. 395, 400 (S.D. Ohio 2002) (internal quotation marks and citations omitted) ("the trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court....  The prospect of such a massive undertaking clearly counsels in favor of settlement.").

In addition, in retiree benefits litigation delay, at the least diminishes -- and for some class members eliminates -- the value of possible victory at some point in the distant future.  Here, in particular, 85% of class members are over 65, some are in their 80s and 90s, and most of these Medicare-eligible class members have been without company-paid health coverage since January 1, 2006, receiving only a limited Medicare premium subsidy.  These class members suffer hardship that has continued during the litigation and settlement process and many of them might not benefit at all from a victory that comes only after more years of litigation.  And, again, absent settlement, all class members would be subject to the uncertainty, risk, hardship and delay attendant to continued litigation which ultimately might leave them with absolutely nothing.

The "risk/delay" factor, too, warrants approval of the settlement, which will provide prompt support for comprehensive health benefits for all class members.

### 3.  The judgment of counsel.

The judgment of the parties' counsel that the settlement is in the best interest of the settling parties "is entitled to significant weight, and supports the fairness of the class settlement." *IUE-CWA,* 238 F.R.D. at 597.  See also *Cardizem*, 218 F.R.D. at 525 ("in approving a proposed settlement, the court also considers the opinion of experienced counsel as to the merits of the settlement").  Here, as discussed, the parties' counsel and the class representatives share the view that the settlement is fair, reasonable, and adequate.

The Court is familiar with counsel for both sides from this litigation and from similar litigation -- see *Cole v. ArvinMeritor* 515 F. Supp.2d 791(E. D. Mich. 2006) -- and, in particular, from counsel's periodic reports on their settlement discussions. The Court recognizes their experience and diligence and concludes that their endorsement of the settlement "is entitled to significant weight." *IUE-CWA*, 238 F.R.D. at 597.

Class counsel represented parties in *IUE-CWA* where Judge Hood remarked: "Counsel for the parties in this case are reputable practitioners and trial counsel experienced in complex class action litigation who have adequately assessed the strengths of their respective claims and positions." 238 F.R.D. at 597. One class counsel was recognized by the Sixth Circuit for his extensive experience and expertise in retiree benefits cases. *UAW v. General Motors*, 497 F.3d at 622, 626. Indeed, counsel on both sides have considerable experience and accomplishments as is demonstrated by their professional resumes. See Docket 48, Ex. 8, 9, 12, 13, and 15-17. Their efforts and analysis in the settlement process, already summarized, displayed an informed, reasoned, practical, and productive approach to the litigation and the settlement process. Their universal assessment that the settlement is in the interest of all parties and is fair, reasonable, and adequate is well-supported and is consistent with the Court's views. See *IUE-CWA*, 238 F.R.D. at 597 (citations omitted): "the Court must rely upon the judgment of experienced counsel and, absent fraud, 'should be hesitant to substitute its own judgment for that of counsel.'" This factor, too, supports approval of the Settlement Agreement.

### 4. The discovery/evidence factor.

The parties exchanged documents and information and jointly created a collection of governing collective bargaining agreements and other documents relevant to their dispute over the nature of retiree health benefits. In addition, defendants provided detailed information about the history and status of the health benefits, including the names and locations of retirees, eligible dependents and surviving spouses, benefits cost calculations and experience data, and other information pertinent to both the litigation and the settlement discussions. Also, in addition to their own internal investigation and information gathering, the parties participated in discovery, including class representatives' depositions, to inform their litigation risk assessment, and had direct communications between their respective benefits professionals to enhance their information exchange and analysis and to inform their settlement discussions. As noted, the parties recognized that the governing documents and pertinent history extend decades into the past, back to the 1960s, and are incomplete and susceptible to conflicting interpretations, creating risks and uncertainties for both sides in continued litigation. The Court finds that through discovery and cooperative information exchange the parties developed a body of documents and information sufficient to permit their informed assessment of the litigation and settlement, sufficient to inform the Court that their dispute is genuine and based on good-faith, albeit diametrically-opposed, legal positions, and sufficient to support the conclusion that the settlement is reasonable and desirable from all perspectives.

The Court concludes that the parties and the Court have sufficient information to conclude that the settlement is a fair, reasonable, and adequate resolution of the parties' dispute. The discovery/evidence factor, too, warrants approval of the settlement under Rule 23(e)(2).

## 5. The fairness factor.

District courts may scrutinize settlements to ensure that absent class members have not "lost out in favor of attorneys and named class members." *IUE-CWA,* 238 F.R.D. at 598 (citations omitted). There is nothing in the parties' Settlement Agreement that improperly benefits attorneys or favors the class representatives. To the contrary, the Court finds that the Settlement Agreement is even-handed in its treatment of class members, does not favor the class representatives, and reasonably provides for class counsel fees and expenses.

The named class representatives are given no special consideration or advantage under the Settlement Agreement. Rather, they are treated the same as all other class members. In addition, the Settlement Agreement provides for class counsel fees based solely on hours worked at reasonable hourly rates, subject to Court approval. There is no provision for a premium "multiplier" to enhance fees or for fees computed as a percentage of the substantial settlement amount. Indeed, the attorney fees requested through June 30, 2008 (see Docket 48) represent about 2.27% of the settlement amount and are subject to Court approval. Fees and expenses sought for work after that date also will be subject to Court approval. Again, the treatment of the class members and the class representatives and class counsel under the Settlement Agreement is fair, reasonable, and adequate. This factor, too, favors settlement.

## 6. The "arm's length" factor.

Courts presume the absence of fraud or collusion in class action settlements unless there is evidence to the contrary. *IUE-CWA*, 238 F.R.D. at 598.

Here, there is no suggestion of fraud or collusion. Indeed, in the years of this litigation since 2004, the parties and their counsel have displayed civil but pronounced and vigorous

disagreement over core questions as well as over other issues in dispute, both in the litigation and in settlement discussions. Counsel for the parties have regularly reported to the Court on their struggles over the substance of the settlement and, until the end, on their struggles over the details of the Settlement Agreement and the other documents relating to the settlement. Like in *IUE-CWA*, the Court concludes that the "process was entirely at arm's length, with each party representing and pursuing its own interests, and exercising independent judgment." 238 F.R.D. at 599.

Moreover, the terms of the Settlement Agreement confirm the absence of collusion. See *IUE-CWA*, 238 F.R.D. at 599 (citations omitted): "The authorities hold that if the settlement agreement itself is fair, reasonable and adequate, then the court may assume that the negotiations were proper and free of collusion." As noted, the Court concludes that the terms of the Settlement Agreement are fair, reasonable, and adequate and, therefore, the Court concludes that the settlement negotiations were, as the parties attest and as all the circumstances indicate, conducted at "arm's length," properly and free of collusion.

The even-handed treatment of class members and the absence of any special or inappropriate treatment of class representatives and class counsel in the Settlement Agreement also demonstrate the absence of collusion. See *IUE-CWA*, 238 F.R.D. at 599, considering that the settlement "provides no preference" for class representatives whose claims are "treated no differently than the claims of" other class members and that class counsel "only seeks fees for hours worked at a reasonable rate ... in accordance with current market rates." *IUE-CWA* cited authority noting that "such an arrangement" for attorney fees was "remarkably modest for litigation of this nature." 238 F.R.D. at 599. The "arm's length" factor also supports approval of the settlement.

### 7. The public interest factor.

The settlement of what likely would otherwise be protracted and sharply-contested "zero sum" litigation, the Court finds, is indeed in the public interest. The settlement benefits the parties and simultaneously serves the public interest in the availability of healthcare and in achieving certainty for retirees and for productive businesses that provide employment in this area and elsewhere. It also serves the public interest in resolving disputes in federal courts with the maximum possible expediency and efficiency. See *Cardizem*, 218 F.R.D. at 530 ("[T]here is a strong public interest in encouraging settlement of complex litigation and class action suits because they are 'notoriously difficult and unpredictable' and settlement conserves judicial resources"). The "public interest" factor, too, favors approval of the settlement.

### C. <u>The Objection.</u>

As discussed, the seven factors identified by the Sixth Circuit as relevant to district court assessments of proposed settlements of class action litigation all support the conclusion that the parties' Settlement Agreement is fair, reasonable, and adequate under Rule 23(e)(2). The objection filed by a single class member does not alter this conclusion.

Only one of the approximately 1,000 class members filed an objection to the settlement. He objected to the amount of the premium cost that he and his wife would be obligated to pay to enroll in two of the initial healthcare programs planned to be offered through the VEBA promptly after approval of the settlement. His objection addresses personal economic considerations, suggesting that he and his wife would be financially better off with regard to premium cost obligations if approval of the settlement was denied and the status quo were to continue for several years. (Docket 50, Ex. 4). This objection does not justify disapproval of the settlement.

First, the fact that only one objection was filed indicates that the settlement is fair, reasonable, and adequate. The single objection represents 1/10 of one percent (.001) of the class. Counting the objector's wife, although she did not file her own objection, the objection represents 1/5 of one percent (.002) of the class. This minimal level of opposition indicates broad support for the settlement among class members. See *IUE-CWA*, 238 F.R.D. at 600, collecting citations holding that "a relative small number of class members who object is an indication of a settlement's fairness," that "minimal opposition suggests that the class as a whole is in favor of the agreements," and that in "the class action context, silence may be construed as consent." See also *Cardizem*, 218 F.R.D. at 527 (a small number of objections is "indicative of the adequacy of the settlement").

Second, the objection is based on flawed premises, as addressed in class counsel's letter to the objector addressing the objection. (Docket 50, Ex. 5). Among other things, the objector's apparent comparison between one of the initial healthcare PPO programs to be provided in 2009 through the VEBA and a 2008 HMO plan with less comprehensive coverage is flawed. Also, the objector's certain assumption that the status quo for his wife would continue for the period before she becomes Medicare-eligible is unwarranted. Nevertheless, even if the objector's assessment were entirely accurate, his particular situation is insufficient to alter the fact that the settlement benefits the class as a whole and is far better than the alternative of continued litigation. See *IUE-CWA*, 238 F.R.D. at 600, collecting citations holding that a "court should not withhold approval of a settlement merely because some class members object," that "the fact that there is opposition does not necessitate disapproval of the settlement," and that the district court "has an obligation to protect the interests of the silent class majority, despite vociferous opposition by a

vocal minority to the settlement."  Here, there is neither "vociferous opposition" nor a "vocal minority" against the settlement.  Indeed, even the lone objector does not contest the fairness or reasonableness or adequacy of the settlement as a whole.  Rather, his objection is personal, limited to his own and his wife's circumstances over the next few years, and while doubtlessly genuine, is based on flawed premises and reflects a limited short-term focus.

In any event, whether or not the lone objection is flawed, its content does not alter the conclusion that the settlement rationally resolves a genuine legal dispute, eliminates risk and uncertainty for all sides, avoids further delay and promptly eliminates hardship, was the product of informed "arm's length" negotiations, serves the interests of the class as a whole, presents a better option than continued litigation, conserves judicial resources and is consistent with the public interest, has the parties' and counsel's endorsement, is within an acceptable "range of reasonableness" and, for all these reasons, is fair, reasonable, and adequate under Rule 23(e)(2).

### III.  CONCLUSION

The Court finds that the Settlement Agreement resolves a genuine legal dispute between the union and retirees on one hand, and defendants on the other, is the product of informed "arm's length" negotiations, achieves a mutually-beneficial settlement in the absence of fraud and duress, eliminates risk and uncertainty for all sides, avoids further delay and promptly eliminates hardship, serves the interests of the class as a whole, presents a better option that continued litigation, and therefore is in compliance with the requirements of Section 302(c)(2) of the Labor-Management Relations Act, 29 U.S.C. §186(c)(2).  See *U.S. v. Mabry*, 518 F.3d 442, 447 (6th Cir. 2008).  In addition, the Court finds that the Settlement Agreement conserves judicial resources, is consistent with the public interest, has the parties' and counsel's endorsement, is within an acceptable "range

of reasonableness" and, considering all the circumstances, is fair, reasonable, and adequate under Rule 23(e)(2).

For the foregoing reasons, the Court approves the parties' settlement and the Settlement Agreement in all respects and as to all parties. The Joint Motion for Order Granting Final Approval of Class Action Settlement (Docket 50) is GRANTED. The Court will issue a judgment accordingly.

Dated: October 7, 2008      _s/ Nancy G. Edmunds_____
             U.S. District Court Judge Nancy G. Edmunds